Mark K. Schonfeld  (MS-2798)
Regional Director
Attorney for Plaintiff
Securities and Exchange Commission
Northeast Regional Office
233 Broadway
New York, New York 10279



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**05 CV     0780**

---

SECURITIES AND EXCHANGE COMMISSION,

                        Plaintiff,

           v.

PENTHOUSE INTERNATIONAL, INC., n/k/a PHSL
WORLDWIDE, INC., CHARLES SAMEL, and
JASON GALANIS,

                      Defendants.

COMPLAINT

05 Civ.

JURY TRIAL DEMANDED

---

      Plaintiff Securities and Exchange Commission for its Complaint against defendants

Penthouse International, Inc., now known as PHSL Worldwide, Inc. ("Penthouse"), Charles Samel

and Jason Galanis alleges as follows:

## PRELIMINARY STATEMENT

      1.      This action arises out of accounting fraud and financial reporting violations at

Penthouse in connection with the company's financial statements for the quarter ended March

31, 2003.  In those financial statements, Penthouse materially overstated its quarterly revenues

by $1 million, thereby converting a net loss of $167,000 into net income of $828,000.  The Form

10-Q in which those financial statements were filed also bore an unauthorized electronic

signature of Robert C. Guccione, Penthouse's principal executive officer and principal financial officer, and thus falsely represented that Guccione had reviewed and signed it, and that he had also reviewed and signed the accompanying Sarbanes-Oxley certification. In fact, Guccione had not seen, nor approved the filing of, the Form 10-Q or the Sarbanes-Oxley certification. Penthouse's auditors and outside counsel also had not reviewed the filing, a fact that was not disclosed in the filing. Samel, Executive Vice-President and a Director of Penthouse, and Galanis, a Penthouse shareholder, prepared and filed the false 10-Q, and were aware of the misrepresentations in it.

2.      Subsequently, Penthouse made two filings on Form 8-K that purported to correct misstatements in the 10-Q, but which continued to make material misrepresentations and omissions. In both of these filings, Penthouse failed to disclose that Guccione had not reviewed, approved or signed the 10-Q or the attached Sarbanes-Oxley certification. In one of these filings, moreover, Penthouse expressly misrepresented that Penthouse's disclosure controls and procedures were adequate. It was not until September 2003, when it filed an amended Form 10-Q for the first quarter of 2003, that Penthouse acknowledged that the first 10-Q had not been signed by Guccione, and that Penthouse had significant weaknesses in its disclosure controls and procedures.

3.      By virtue of the conduct alleged in this Complaint: (a) Penthouse directly or indirectly, singly or in concert, has engaged, and may be continuing to engage, in acts, practices and courses of business that constitute violations of Sections 10(b) and 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78o(d), and Rules 10b-5, 12b-20, 15d-11, 15d-13 and 15d-14 thereunder, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.15d-11, 240.15d-13 and 240.15d-14; (b) Samel, directly or indirectly, singly or in concert, has

engaged, and may be continuing to engage, in acts, practices and courses of business that

constitute violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5,

17 C.F.R. § 240.10b-5 thereunder, and has aided and abetted, and may be continuing to aid and

abet, violations of Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d) and Rules 12b-20,

15d-13 and 15d-14 thereunder, 17 C.F.R. §§ 240.12b-20, 240.15d-13 and 240.15d-14; and (c)

Galanis, singly or in concert, has aided and abetted, and may be continuing to aid and abet,

violations of Sections 10(b) and 15(d) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78o(d), and

Rules 10b-5, 12b-20, 15d-13 and 15d-14 thereunder, 17 C.F.R. §§ 240.10b-5, 240.12b-20,

240.15d-13 and 240.15d-14.

     4.     Unless restrained and enjoined by this Court, defendants will continue to engage

in the transactions, acts, practices and courses of business described herein, and in transactions,

acts, practices, and courses of business of a similar type and object.

     5.     By this action, the Commission seeks: (a) permanent injunctive relief; (b) civil

penalties; (c) an officer and director bar against Samel and Galanis; and (d) such further relief as

the Court may deem appropriate.

## JURISDICTION

     6.     The Commission brings this action pursuant to the authority conferred upon it by

Sections 21(d) and 21A of the Exchange Act, 15 U.S.C. § 78u(d) and 78u-1. This Court has

subject matter jurisdiction over this action pursuant to Sections 21(d)(2), 21(d)(3), 21(e), 21A

and 27 of the Exchange Act, 15 U.S.C. §§ 78(u)(d)(2), 78(u)(d)(3), 78(u)(e), 78u-1 and 78aa.

Defendants, directly and indirectly, have made use of the means or instrumentalities of

transportation or communication in, and the means or instrumentalities of interstate commerce,

or of the mails, or of the facilities of a national securities exchange, in connection with the

transactions, acts, practices, and courses of business alleged herein.  Certain of these

transactions, acts, practices and courses of business occurred in the Southern District of New

York.

## DEFENDANTS

7.      Penthouse was at all relevant times a corporation organized under the laws of

Florida and headquartered in New York, New York.   Its primary business was the publication of

Penthouse, a men's entertainment magazine with adult content owned by a Penthouse subsidiary,

General Media, Inc. ("GMI").   As of December 31, 2002, Penthouse had fewer than 300

shareholders, but its stock continued to be quoted on the Over-the-Counter Bulletin Board under

the symbol PHSL.   Its trading symbol has since changed to PHSL.PK.

8.      Samel resides in Sherman Oaks, California, and at all relevant times was

Executive Vice President and Director of Penthouse.  Samel owns approximately 4% of

Penthouse's common stock.

9.      Galanis resides in Santa Monica, California.  Through his company Vector

Partners, Galanis owns approximately 8% of Penthouse's common stock.   Galanis at all relevant

times was also the Chairman and Chief Executive Officer of EGX Funds Transfer, Inc., an

electronic transaction data processing holding company based in Colorado.  At all relevant times,

EGX was a public company, and filed periodic reports with the Commission.

## RELATED PERSON

10.      Guccione resides in New York, N.Y., and during the relevant period served as

Penthouse's "principal executive officer" and "principal financial officer" within the meaning of

the Sarbanes-Oxley certification rule, Exchange Act Rule 15d-14.  During the relevant period,

Guccione, directly and indirectly, owned and controlled approximately 85% of Penthouse's

4

common stock.  Guccione resigned from his positions at Penthouse in November 2003, and no longer owns any of its common stock.

## FACTS

### The Fraudulent Form 10-Q and Events Leading Up to its Filing

11.     In late 2002 and in early 2003, Galanis negotiated an agreement with Penthouse under which he would manage GMI's web-based businesses through another company he intended to form, Penthouse Financial, and have the right to use Penthouse trademarks in doing so, in exchange for a portion of the revenues he generated (the "Agreement").  The Agreement required Galanis' company, Penthouse Financial, to pay $1 million to Penthouse as a non-refundable licensing fee.  The parties agreed that payment of the licensing fee would be made by forgiveness of a $1 million note payable to Galanis.  The parties executed the Agreement in May 2003.

12.     On April 30, 2003, Penthouse filed its first annual financial statement on Form 10-K for the fiscal year ended December 31, 2002.  Attached to the Form 10-K was a Sarbanes-Oxley certification, in which Guccione certified, among other things, that he was responsible for establishing and maintaining disclosure controls and procedures as defined in Exchange Act Rule 15d-14, the certification rule adopted pursuant to Section 302 of the Sarbanes-Oxley Act. Guccione further certified that he had designed such disclosure controls and procedures to ensure that material information relating to Penthouse, including its consolidated subsidiaries, was made known to Penthouse's management.  Before it was filed, the Form 10-K was reviewed by Penthouse's outside counsel and its auditors, consistent with the procedure GMI had followed in filing periodic reports for many years.

13.     In early May, GMI's Vice President of Financial Services, William Vazoulas, circulated draft financials for the quarter ended March 31, 2003 -- the first quarter of GMI's and Penthouse's 2003 fiscal year -- to GMI's Chief Operating Officer, Stephen Gross, and to Samel. At Samel's direction, a copy of the financials was also sent to Galanis. These draft financial statements did not include as revenue for the quarter the $1 million payment received under the Agreement.

14.     After Galanis received a revised version of the Form 10-Q, he insisted that the entire $1 million licensing fee be included in Penthouse's reported revenue for the quarter. In a May 18 email to Gross, Galanis revised the management discussion in the Form 10-Q to include the entire $1 million as revenue.

15.     Vazoulas, a certified public accountant, explained to Gross and Galanis that it would be improper to include the entire $1 million payment as revenue in the first quarter of 2003, but rather that the revenue would have to be recognized on an amortized basis over the five-year term of the Agreement. Further, Vazoulas explained that since the Agreement was not executed until the second quarter, Penthouse could not begin to recognize the revenue until the second quarter. Galanis, however, continued to insist that the entire $1 million licensing fee be recognized as revenue in the first quarter.

16.     On or about May 22, Vazoulas consulted with Penthouse's outside auditor, Eisner LLP, regarding the proper treatment of the $1 million licensing fee under generally accepted accounting principles ("GAAP"). Eisner had not yet begun its review of Penthouse's financials, but it provided a preliminary view to Vazoulas that it would be inconsistent with GAAP to include the $1 million payment as revenue in the financial statements for the quarter ended March 31, 2003.

6

17.     On May 22, Gross and Vazoulas had a conference call with Galanis, during which Galanis was informed of Vazoulas' objection to recording the $1 million as revenue for the first quarter.  Galanis disagreed and asked Gross and Vazoulas to prepare a version of the Form 10-Q that included the $1 million as revenue for the quarter, so that they could present both to Eisner. That same day, Vazoulas and Gross advised Samel that Eisner would commence its review of the Form 10-Q the following week, and that the Form 10-Q could not be filed before Eisner had conducted its review.

18.     Samel and Galanis assured Gross that they would wait until Eisner had reviewed the Form 10-Q and advised on the proper method of accounting for the payment under the Agreement.

19.     Instead, however, Samel and Galanis decided to file the Form 10-Q without any review by Eisner or Penthouse's outside counsel – contrary to Penthouse's established practice. On May 23, while both were in Galanis' California office, they arranged for the Form 10-Q reflecting the $1 million payment as revenue for the quarter to be filed with the Commission

20.     By improperly including that payment as revenue in the first quarter, Penthouse materially overstated its revenues by $1 million, and converted what would have been a reported net loss for the quarter (in the amount of $167,000) into net income, in the amount of $828,000. The inclusion of the $1 million payment under the Agreement was not consistent with GAAP, because that payment should have been amortized over the five-year life of the Agreement, and that amortization should have commenced in the second quarter.

21.     Samel and Galanis filed the Form 10-Q without any advance notice to, or review by, Penthouse's principal executive officer and principal financial officer, Guccione.  The Form 10-Q and the accompanying certification required under the Sarbanes-Oxley Act nonetheless

purported to bear Guccione's electronic signature, although Galanis and Samel knew that Guccione had neither seen nor signed the 10-Q or the certification.

**The Fraudulent Forms 8-K**

22.     On May 29, 2003, six days after Penthouse filed its false Form 10-Q, Penthouse filed a Form 8-K disclosing that Eisner had resigned as Penthouse's auditor in a dispute over the Form 10-Q.   The Form 8-K reported that Penthouse received a letter from Eisner on May 29, in which Eisner stated that Penthouse's Form 10-Q failed to disclose that the financial statements contained in the 10-Q had not been reviewed by Eisner or other independent certified public accountants.  In the letter, which was attached as an Exhibit to the Form 8-K, Eisner also stated that Penthouse had asked it to consider the accounting treatment regarding a transaction, for which it presented a preliminary view.  According to the letter, Penthouse accounted for this transaction in its Form 10-Q in a manner contrary to the preliminary view Eisner had expressed to Penthouse.  Penthouse did not disclose in this Form 8-K that, contrary to the representations in the Form 10-Q, Guccione did not review or sign the 10-Q or the Sarbanes-Oxley certification, nor did the Form 8-K disclose that the Form 10-Q had not been reviewed by outside counsel.

23.     After the close of business on June 13, Penthouse filed another Form 8-K, disclosing that certain statements in its Form 10-Q were inaccurate.  First, Penthouse noted that the Form 10-Q had stated that the Agreement was entered into as of January 13, 2003, although in fact it was not entered into until May 21, 2003.  Second, Penthouse corrected the description of the parties to the Agreement and the timing and method of the $1 million payment.  Finally, Penthouse announced its intention to file an amended Form 10-Q, and urged investors not to rely on the Form 10-Q that was already filed.

8

24.     The June 13th Form 8-K, like the prior one, did not disclose that Guccione had not reviewed or signed the Form 10-Q or the Sarbanes-Oxley certification, and had not authorized the filing of the Form 10-Q. Yet it also affirmatively represented that Penthouse's internal disclosure controls and procedures were adequate and that the inaccurate Form 10-Q was caused by a failure to follow those adequate procedures.

25.     On September 25, 2003, Penthouse filed an amended Form 10-Q for the first quarter, together with a Form 10-Q for the quarter ended June 30, 2003. The amended Form 10-Q noted that the original Form 10-Q was not reviewed, signed or approved by Guccione, that the financial statements contained therein were inaccurate, and that the filing had failed to disclose that the Company's independent auditors had not reviewed it before it was filed. The restated financials contained in the amended Form 10-Q reported revenue of $11,072,000 for the first quarter (compared to $12,072,000 as stated in the original 10-Q), and a net loss of $1,193,000 (compared to net income of $828,000 as stated in the original 10-Q). The amended Form 10-Q, and the Form 10-Q filed for the second quarter, stated that the company had determined that there were significant weaknesses in its disclosure controls – a statement that contradicted the earlier assurances in the June 13 Form 8-K.

### FIRST CLAIM FOR RELIEF
### Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Penthouse and Samel)

26.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 25.

27.     Penthouse and Samel, directly or indirectly, singly or in concert, by use of the means and instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the offer, purchase, or sale of Penthouse's

securities, knowingly or recklessly, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or has omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of Penthouse's securities and upon other persons.

28.    As part, and in furtherance, of the violative conduct, Samel improperly and materially inflated Penthouse's reported financial results in its Form 10-Q for the quarter ended March 31, 2003, by improperly recognizing as revenue the $1 million payment pursuant to the Agreement, which was not executed until the following quarter, and which should have been amortized over the five-year term of the Agreement.

29.    As part, and in furtherance, of the violative conduct, Samel filed the Form 10-Q without prior review by, or approval of, Penthouse's counsel, auditors or principal executive or financial officers, while knowing that the Form 10-Q misrepresented or omitted to disclose those facts to Penthouse's investors.

30.    As part, and in furtherance, of the violative conduct, Penthouse, before it filed the Form 10-Q, issued a Form 10-K that falsely assured investors that its disclosure control procedures were adequate. In addition, and also in furtherance of this violative conduct, Penthouse issued Forms 8-K that also falsely assured investors that its disclosure control procedures were adequate, while omitting to disclose that the Form 10-Q had been filed without prior review or approval of Guccione.

31.    Penthouse and Samel knew, or were reckless in not knowing, that Penthouse's Form 10-K, Form 10-Q and Forms 8-K were materially false and misleading.

32.     By reason of the foregoing, Penthouse and Samel, singly or in concert, directly or indirectly, violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### SECOND CLAIM FOR RELIEF
#### Aiding and Abetting Violations of
#### Section 10(b) of the Exchange Act and Rule 10b-5
#### (Against Galanis)

33.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 32.

34.     Galanis substantially assisted the violations of Section 10(b) of the Exchange Act and Rule 10b-5 by Penthouse and Samel described above, by, among other things, participating in the drafting of the false and misleading Form 10-Q; exercising control and influence over Samel for the purpose of ensuring that Penthouse would file a Form 10-Q for the quarter ended March 31, 2003 that materially overstated revenues and income; misrepresenting to Samel that he had received confirmatory advice from accountants (when in fact he had received no such advice); and assisting Samel with the filing of the Form 10-Q.

35.     Galanis was aware that Penthouse's and Samel's conduct in filing the Form 10-Q was improper.

36.     By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e),  Galanis aided and abetted violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF
#### Violations of Section 15(d) of the Exchange Act and
#### Rule 12b-20 and 15d-13
#### (Against Penthouse)

37.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 36.

38.     Penthouse failed to file with the Commission, in accordance with the Commission's rules and regulations, such quarterly reports as the Commission has prescribed, and Penthouse failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they are made, not misleading, in violation of Section 15(d) of the Exchange Act and Rules 12b-20 and 15d-13 promulgated thereunder.  As alleged above, Penthouse's Form 10-Q for the quarter ended March 31, 2003 was false and misleading because, among other things, it materially overstated Penthouse's revenue and net income, falsely represented that Penthouse's principal executive and financial officer had reviewed and signed it and the accompanying Sarbanes-Oxley certification, and failed to disclose that Penthouse's auditors and outside counsel had not reviewed it before it was filed.

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Sections 15(d)**
**of the Exchange Act and Rules 12b-20 and 15d-13**
**(Against Samel and Galanis)**

39.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 38.

40.     Galanis substantially assisted Penthouse's violations of Section 15(d) of the Exchange Act and Rules 12b-20 and 15d-13 by, among other things, participating in drafting the false and misleading Form 10-Q; exercising control and influence over Samel for the purpose of ensuring that Penthouse would file a Form 10-Q for the quarter ended March 31, 2003 that materially overstated revenues and income; and misrepresenting to Samel that he had received

confirmatory advice from accountants (when in fact he had received no such advice), and assisting Samel with the filing of the Form 10-Q.

41.    Galanis was aware that Penthouse's and Samel's conduct in filing the Form 10-Q was improper.

42.    Samel substantially assisted Penthouse's violations by, among other things, filing the false and misleading Form 10-Q.

43.    Samel was aware that his conduct and that of Penthouse was improper.

44.    By reason of the foregoing, Galanis and Samel, singly or in concert, aided and abetted Penthouse's violations of Section 15(d) of the Exchange Act and Rules 12b-20 and 15d-13.

### FIFTH CLAIM FOR RELIEF
### Violations of Section 15(d) and Rule 15d-14
### (Against Penthouse)

45.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 44.

46.    Rule 15d-14 of the Exchange Act requires, among other things, that principal executive and financial officers certify that based on their knowledge, the issuer's financial statements are accurate.  It also requires that the certifying officer(s) establish and maintain appropriate disclosure controls and procedures.

47.    Penthouse violated Rule 15d-14 by issuing a Form 10-Q for the quarter ended March 31, 2003 that that purported to have been signed by its principal executive officer and principal financial officer, Guccione, but which Guccione in fact had never even seen, much less signed.  Penthouse also violated Rule 15d-14 by failing to establish or maintain appropriate disclosure controls and procedures with respect to the filing of the Form 10-Q.

### SIXTH CLAIM FOR RELIEF
#### Aiding and Abetting Violations of Section 15(d)
#### of the Exchange Act and Rule 15d-14
#### (Against Samel)

48.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 47.

49.     Samel substantially assisted Penthouse's violation of Section 15(d) of the

Exchange Act and Rule 15d-14 thereunder by filing the Form 10-Q for the quarter ended March

31, 2003 on behalf of Penthouse, despite the fact that it falsely represented that it, and the

accompanying Sarbanes-Oxley certification, had been reviewed and signed by Penthouse's

principal executive officer and principal financial officer, Guccione.

50.     Samel was aware that his filing of the Form 10-Q on behalf of Penthouse was

improper.

51.     By reason of the foregoing, Samel aided and abetted Penthouse's violations of

Section 15(d) of the Exchange Act and Rule 15d-14 thereunder.

### SEVENTH CLAIM FOR RELIEF
#### Violations of Section 15(d) of the Exchange Act and Rule 15d-11
#### (Against Penthouse)

52.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 51.

53.     Penthouse was required by Rule 15d-11 to file accurate current reports on Form

8-K.  On May 9 and June 13, Penthouse filed Form 8-Ks commenting on the Form 10-Q that had

been filed on May 23.  These Form 8-Ks were inaccurate because they failed to disclose that

Guccione had not reviewed, signed or approved the Form 10-Q and accompanying Sarbanes-

Oxley certification, nor even seen it before it was filed, and, in one instance, falsely stated that Penthouse's disclosure controls and procedures were adequate.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that the Court:

1.    Enter a Final Judgment:

a.    permanently restraining and enjoining defendant Penthouse, and its agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service, express courier service, facsimile or otherwise, and each of them, from, directly or indirectly, violating Sections 10(b) and 15(d) of the Exchange Act, and Rules 10b-5, 12b-20, 15d-11, 15d-13 and 15d-14 promulgated thereunder;

b.    permanently restraining and enjoining Samel, his agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service, express courier service, facsimile or otherwise, and each of them, from, directly or indirectly, violating Sections 10(b) of the Exchange Act, and Rule 10b-5, and from aiding and abetting violations of Section 15(d) of the Exchange Act and Rules 12b-20, 15d-13 and 15d-14 promulgated thereunder;

c.    permanently enjoining Galanis, his agents, servants, employees, attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service, express courier service, facsimile or otherwise, and each of them, from aiding and abetting violations of Sections 10(b) and 15(d) of the Exchange Act, and Rules 10b-5, 12b-20, 15d-13 and 15d-14 promulgated thereunder;

d.      directing all defendants to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and

e.      ordering that, pursuant to Section 21(d)(2) of the Exchange Act, defendant Samel and Galanis be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

2.      Grant such other and further relief as the Court may deem just and proper.

Dated:  New York, NY
January 24, 2005

Mark K. Schonfeld (MS-2798)
Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
233 Broadway
New York, NY 10279
(646) 428-1754 (Primoff)

Of counsel

Richard G. Primoff
Timothy G. Hansen

16