UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

        - against -

PENTHOUSE INTERNATIONAL, INC., n/k/a
PHSL WORLDWIDE, INC., CHARLES SAMEL,
and JASON GALANIS,

                    Defendants.

------------------------------------------X

05 Civ. 0780 (RWS)

O P I N I O N

A P P E A R A N C E S:

        SECURITIES AND EXCHANGE COMMISSION
        Northeast Regional Office
        Attorney for Plaintiff
        233 Broadway
        New York, NY 10279
        By:  MARK K. SCHONFELD, ESQ.
             Regional Director
             Of Counsel

        SAIBER, SCHLESINGER, SATZ & GOLDSTEIN
        Attorneys for Defendant Charles Samel
        One Gateway Center, 13th Floor
        Newark, NJ 07102
        By:  ERNEST E. BADWAY, ESQ.
             Of Counsel

9/29/05

Sweet, D.J.,

Defendant Charles Samel ("Samel" or the "Defendant") has moved under Rules 9(b) and 12(b)(6), Fed. R. Civ. P., to dismiss: 1) the first cause of action alleging a violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; 2) the fourth cause of action alleging that he aided and abetted violations of Section 15(d) of the Exchange Act, 15 U.S.C. § 78(d), and Rules 12b-20 and 15d-13; and 3) the sixth cause of action alleging violations of Section 15(d) of the Exchange Act and Rule 15d-14. For the reasons set forth below, the motion is denied.

**Prior Proceedings**

The Securities and Exchange Commission ("SEC") filed its complaint against the defendants Penthouse International, Inc. ("Penthouse"), PHSL Worldside, Inc. ("PHSL"), Samel, and Jason Galanis ("Galanis") on January 24, 2005, alleging seven causes of action arising out of accounting fraud and financial reporting violations contained in the Penthouse financial statements for the quarter ended March 31, 2003 and subsequent Form 8-K and Sarbanes-Oxley certifications.

The instant motion to dismiss was heard and marked fully submitted on April 27, 2005.

## The Facts

The following facts are drawn from the complaint, which includes "any documents incorporated in it by reference, annexed to it as an exhibit, or 'integral' to it because it 'relies heavily upon [such document's] terms and effect.'" Pollock v. Ridge, 310 F. Supp. 2d 519, 524 (W.D.N.Y. 2004) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (internal quotations omitted)). All well-pleaded allegations are accepted as true for the purpose of this motion. See Chambers, 282 F.3d at 152. The following statements do not constitute findings of the Court.

The complaint alleges that Penthouse, in its financial statements, materially overstated its quarterly revenues by $1 million, thereby converting a net loss of $167,000 into net income of $828,000 for the quarter ended March 31, 2003. The Form 10-Q, in which those financial statements were filed, also bore an unauthorized electronic signature of Robert C. Guccione ("Guccione"), Penthouse's principal executive officer and principal financial officer who had not seen nor approved the filing of the Form 10-Q or the Sarbanes-Oxley certification. Penthouse's auditors and outside counsel also had not reviewed the filing, a fact that was not disclosed in the filing. According to the SEC,

Samel, executive vice-president and a director of Penthouse, and Galanis, a Penthouse shareholder, prepared and filed the false 10-Q, and were aware of the misrepresentations in it. (See Complaint at ¶ 1).

The complaint alleges further that Penthouse made two filings on Form 8-K that purported to correct misstatements in the 10-Q, but which continued to make material misrepresentations and omissions, failing to disclose that Guccione had not reviewed, approved or signed the 10-Q or the attached Sarbanes-Oxley certification and misrepresenting that Penthouse's disclosure controls and procedures were adequate. (See Complaint at ¶ 2).

According to paragraphs 7 through 10 of the complaint, Penthouse was a corporation organized under the laws of Florida and headquartered in New York, New York at all relevant times. Its primary business was the publication of Penthouse, a men's entertainment magazine with adult content, owned by a Penthouse subsidiary, General Media, Inc. ("GMI"). As of December 31, 2002, Penthouse had fewer than 300 shareholders, but its stock continued to be quoted on the Over-the-Counter Bulletin Board under the symbol PHSL. Its trading symbol has since changed to PHSL.PK.

Samel resides in Sherman Oaks, California, and at all relevant times was executive vice-president and director of

Penthouse. Samel owns approximately 4% of Penthouse's common stock.

Galanis resides in Santa Monica, California. Through his company Vector Partners, Galanis owns approximately 8% of Penthouse's common stock. Galanis at all relevant times was also the chairman and chief executive officer of EGX Funds Transfer, Inc., an electronic transaction data processing holding company based in Colorado. At all relevant times, EGX was a public company and filed periodic reports with the SEC.

Guccione resides in New York, New York, and during the relevant period served as Penthouse's "principal executive officer" and "principal financial officer" within the meaning of the Sarbanes-Oxley certification rule, Exchange Act Rule 15d-14. During the relevant period, Guccione, directly and indirectly, owned and controlled approximately 85% of Penthouse's common stock. Guccione resigned from his positions at Penthouse in November 2003, and no longer owns any of its common stock.

The facts giving rise to this action are alleged in paragraphs 11 through 25 which follow.

## The Fraudulent Form 10-Q And Events Leading Up To Its Filing

In late 2002 and in early 2003, Galanis negotiated an agreement with Penthouse under which he would manage GMI's web-based business through another company he intended to form, Penthouse Financial, and have the right to use Penthouse trademarks in doing so in exchange for a portion of the revenues he generated (the "Agreement"). The Agreement required Galanis' company, Penthouse Financial, to pay $1 million to Penthouse as a non-refundable licensing fee. The parties agreed that payment of the licensing fee would be made by forgiveness of a $1 million note payable to Galanis. The parties executed the Agreement in May 2003.

On April 30, 2003, Penthouse filed its first annual financial statement on Form 10-K for the fiscal year ended December 31, 2002. Attached to the Form 10-K was a Sarbanes-Oxley certification, in which Guccione certified, among other things, that he was responsible for establishing and maintaining disclosure controls and procedures as defined in Exchange Act Rule 15d-14, the certification rule adopted pursuant to section 302 of the Sarbanes-Oxley Act. Guccione further certified that he had designed such disclosure controls and procedures to ensure that material information relating to Penthouse, including its consolidated subsidiaries, was made known to Penthouse's management. Before it was filed, the Form 10-K was reviewed by Penthouse's outside

counsel and its auditors, consistent with the procedure GMI had followed in filing periodic reports for many years.

In early May, GMI's vice president of financial services, William Vazoulas ("Vazoulas"), circulated draft financials for the quarter ended March 31, 2003 -- the first quarter of GMI's and Penthouse's 2003 fiscal year -- to GMI's chief operating officer, Stephen Gross ("Gross") and to Samel. At Samel's direction, a copy of the financials was also sent to Galanis. These draft financial statements did not include as revenue for the quarter the $1 million payment received under the Agreement.

After Galanis received a revised version of the Form 10-Q, he insisted that the entire $1 million licensing fee be included in Penthouse's reported revenue for the quarter. In a May 18, 2003 e-mail to Gross, Galanis revised the management discussion in the Form 10-Q to include the entire $1 million as revenue.

Vazoulas, a certified public accountant, explained to Gross and Galanis that it would be improper to include the entire $1 million payment as revenue in the first quarter of 2003, but rather that the revenue would have to be recognized on an amortized basis over the five-year term of the Agreement. Further, Vazoulas explained that since the Agreement was not executed until the second quarter, Penthouse could not begin to recognize the revenue until the second quarter. Galanis, however, continued to insist

that the entire $1 million licensing fee be recognized as revenue in the first quarter.

On or about May 22, 2003, Vazoulas consulted with Penthouse's outside auditor, Eisner LLP, regarding the proper treatment of the $1 million licensing fee under generally accepted accounting principles ("GAAP"). Eisner had not yet begun its review of Penthouse's financials, but it provided a preliminary view to Vazoulas that it would be inconsistent with GAAP to include the $1 million payment as revenue in the financial statements for the quarter ended March 31, 2003.

On May 22, Gross and Vazoulas had a conference call with Galanis, during which Galanis was informed of Vazoulas' objection to recording the $1 million as revenue for the first quarter. Galanis disagreed and asked Gross and Vazoulas to prepare a version of the Form 10-Q that included the $1 million as revenue for the quarter so that they could present both to Eisner. That same day Vazoulas and Gross advised Samel that Eisner would commence its review of the Form 10-Q the following week, and that the Form 10-Q could not be filed before Eisner had conducted its review.

Samel and Galanis assured Gross that they would wait until Eisner had reviewed the Form 10-Q and advised on the proper method of accounting for the payment under the Agreement. Instead, however, Samuel and Galanis decided to file the Form 10-Q without

any review by Eisner or Penthouse's outside counsel, contrary to Penthouse's established practice. On May 23, 2003, while both Samel and Galanis were in Galanis' California office, they arranged for the Form 10-Q reflecting the $1 million payment as revenue for the quarter to be filed with the SEC.

By improperly including that payment as revenue in the first quarter, Penthouse materially overstated its revenues by $1 million, and converted what would have been a reported net loss for the quarter (in the amount of $167,000) into net income, in the amount of $828,000. The inclusion of the $1 million payment under the Agreement was not consistent with GAAP because that payment should have been amortized over the five-year life of the Agreement and that amortization should have commenced in the second quarter.

Samel and Galanis filed the Form 10-Q without any advance notice to, or review by, Penthouse's principal executive officer and principal financial officer, Guccione. The Form 10-Q and the accompanying certification required under the Sarbanes-Oxley Act nonetheless purported to bear Guccione's electronic signature, although Galanis and Samel knew that Guccione had neither seen nor signed the 10-Q or the certification.

## The Fraudulent Forms 8-K

On May 29, 2003, six days after Penthouse filed its false Form 10-Q, Penthouse filed a Form 8-K disclosing that Eisner had resigned as Penthouse's auditor in a dispute over the Form 10-Q. The Form 8-K reported that Penthouse received a letter from Eisner on May 29, 2003, in which Eisner stated that Penthouse's Form 10-Q failed to disclose that the financial statements contained in the 10-Q had not been reviewed by Eisner or other independent certified public accountants. In the letter, which was attached as an exhibit to the Form 8-K, Eisner also stated that Penthouse had asked it to consider the accounting treatment regarding a transaction, for which it presented a preliminary view. According to the letter, Penthouse accounted for this transaction in its Form 10-Q in a manner contrary to the preliminary view Eisner had expressed to Penthouse. Penthouse did not disclose in this Form 8-K that, contrary to the representations in the Form 10-Q, Guccione did not review or sign the 10-Q or the Sarbanes-Oxley certification or that the Form 10-Q had not been reviewed by outside counsel.

After the close of business on June 13, 2003, Penthouse filed a second Form 8-K (the "June 13 Form 8-K"), disclosing that certain statements in its Form 10-Q were inaccurate. First, Penthouse noted that the Form 10-Q had stated that the Agreement was entered into as of January 13, 2003, although in fact it was not entered into until May 21, 2003. Second, Penthouse corrected

the description of the parties to the Agreement and the time and method of the $1 million payment. Finally, Penthouse announced its intention to file an amended Form 10-Q and urged investors not to rely on the initial Form 10-Q that already had been filed.

The June 13 Form 8-K, like the first one filed on May 29, 2003, did not disclose that Guccione neither had reviewed or signed the Form 10-Q or the Sarbanes-Oxley certification nor authorized the filing of the Form 10-Q. Yet it also affirmatively represented that Penthouse's internal disclosure controls and procedures were adequate and that the inaccurate Form 10-Q was caused by a failure to follow those adequate procedures.

On September 25, 2003, Penthouse filed an amended Form 10-Q for the first quarter, together with a Form 10-Q for the quarter ended June 30, 2003. The amended Form 10-Q noted that the original Form 10-Q was not reviewed, signed or approved by Guccione, that the financial statements contained therein were inaccurate, and that the filing had failed to disclose that the company's independent auditors had not reviewed it before it was filed. The restated financials contained in the amended Form 10-Q reported revenue of $11,072,000 for the first quarter (compared to $12,072,000 as stated in the original 10-Q), and a net loss of $1,193,000 (compared to net income of $828,000 as stated in the original 10-Q). The amended Form 10-Q, and the Form 10-Q filed for the second quarter, stated that the company had determined that

10

there were significant weaknesses in its disclosure controls, a statement that contradicted the earlier assurance in the June 13 Form 8-K.

The first cause of action against which Samel has moved alleges his participation in the filing of the Form 10-Q for the quarter ended March 31, 2003. The fourth cause of action alleges that Samel aided and abetted Galanis in filing the original Form 10-Q. The sixth cause of action alleges that Samel aided and abetted Penthouse in filing the false Form 10-Q containing a misrepresentation with respect to Guccione's review and the Sarbanes-Oxley certification.

**The Rule 9(b) Motion Is Denied**

A.    **The Rule 9(b) Standard**

A claim under section 10(b) of the Exchange Act, such as the one presented in the first count of the complaint, sounds in fraud and therefore must meet the pleading requirements of Rule 9(b), Fed. R. Civ. P. See, e.g., In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir. 2001). Such a claim also must satisfy certain requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). See 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(2); see generally Novak v. Kasaks, 216 F.3d 300, 306-07 (2d Cir. 2000) (setting forth the heightened pleading standards of

11

the PSLRA that must be met by a plaintiff who alleges securities fraud under Section 10(b) and Rule 10b-5; <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1127 (2d Cir. 1994) (stating that "[s]ecurities fraud allegations under § 10(b) and Rule 10b-5 are subject to the pleading requirements of Rule 9(b)").

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). The Second Circuit "has read Rule 9(b) to require that a complaint [alleging fraud] '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" <u>Rombach v. Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004) (quoting <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993)). <u>See</u>, <u>e.g.</u>, <u>Ouaknine v. MacFarlane</u>, 897 F.2d 75, 79 (2d Cir. 1990), <u>cert. denied</u>, 502 U.S. 921 (1991); <u>Cosmas v. Hassett</u>, 886 F.2d 8, 11 (2d Cir. 1984); <u>Center Savings & Loan Association v. Prudential-Bache Securities Inc.</u>, 679 F. Supp. 274, 277 (S.D.N.Y. 1987).

Rule 9(b) is designed to ensure that a defendant is informed sufficiently of the allegations against him such that he is in a position to answer the complaint and prepare a defense. <u>Klein v. Computer Devices, Inc.</u>, 591 F. Supp. 270, 279 n.27

(S.D.N.Y. 1984), _accord_ _Spear, Leeds & Kellogg v. Public Service_
_Co. of New Hampshire_, 700 F. Supp. 791, 793 (S.D.N.Y. 1988)
(complaint was sufficient because it gave "fair and reasonable
notice to defendants of the claim and the grounds upon which it is
based, thus satisfying one of the main purposes of Rule 9(b)");
_Conan Properties, Inc. v. Mattel, Inc._, 619 F. Supp. 1167, 1173
(S.D.N.Y. 1985) ("[d]efendant is on sufficient notice of what
[plaintiff] is charging").

In the Second Circuit, the pleading standard for scienter
is satisfied "'(a) by alleging facts to show that defendants had
both motive and opportunity to commit fraud, or (b) by alleging
facts that constitute strong circumstantial evidence of conscious
misbehavior or recklessness.'" _Ganino v. Citizens Utilities Co._,
228 F.3d 154, 168-69 (2d Cir. 2000) (quoting _Shields v. City-trust_
_Bancorp, Inc._, 25 F.3d 1124, 1129-30 (2d Cir. 1994)).

**B.   Discussion**

The complaint has specified when and where Samel filed
Penthouse's materially false and misleading Form 10-Q; the dates on
which Samel was advised that filing the Form 10-Q in advance of the
auditor's review was improper, and the individuals who so advised
him; and the steps Samel took to file the forged Form 10-Q while
concealing his actions from others in Penthouse's management.   It
alleges the factual basis for Samel's knowledge or reckless

13

disregard of the significant overstatement of Penthouse's revenue and income in the Form 10-Q, and his decision to file it nonetheless. (See Complaint at ¶¶ 17-19).

The factual allegations describe a corporate executive acting consciously, or at a minimum, recklessly, to deceive not only the investing public but others in Penthouse's management.

Samel devotes only one paragraph in his motion papers to refute the allegations concerning his role in the filing of the Form 10-Q. Moreover, this paragraph ignores the complaint's allegations against Samel and asserts that the alleged facts "appear to indicate that Samel relied heavily on the advice and counsel of others." (Samel Memorandum at 8). It demonstrates that Samel is aware of the factual charges against him, which are adequately described in the complaint.

## The Rule 12(b)(6) Motion Is Denied

### A.     The Rule 12(b)(6) Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Chambers, 282 F.3d at 152 (citing Gregory v. Daly, 243 F.3d 687,

691 (2d Cir. 2001)). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." _Villager Pond, Inc. v. Town of Darien_, 56 F.3d 375, 378 (2d Cir. 1995) (quoting _Scheuer v. Rhodes_, 416 U.S. 232, 236 (1974)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." _Sweet v. Sheahan_, 235 F.3d 80, 83 (2d Cir. 2000).

A violation of Section 10(b) of the Exchange Act and Rule 10b-5 takes place when there is (1) a misstatement or omission of a material fact, (2) in connection with the purchase or sale of securities, and (3) scienter. _See Basic, Inc. v. Levinson_, 485 U.S. 224, 235 n.13 (1988). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. _Basic_, 485 U.S. at 231. "Scienter" is a "mental state embracing the intent to deceive, manipulate or defraud," _Ernst & Ernst v. Hochfelder_, 425 U.S. 185, 193 n.12 (1976), which in the Second Circuit amounts to knowing or reckless conduct. _E.g._, _Novak v. Kasaks_, 216 F.3d 300, 306-10 (2d Cir. 2000), _cert. denied_, 531 U.S. 1012 (2000); _IIT v. Cornfeld_, 619 F.2d 909, 923 (2d Cir. 1980).

## B.   Discussion

### Count One:   Fraud Claim

#### 1.   Materiality

Samel has contended that the SEC's complaint has failed to allege adequately materiality, and thereby fails to state a claim adequately pursuant to Rule 12(b)(6), because it has not established a change in the market price of Penthouse's stock "immediately following disclosure."   (Samel Memorandum at 12). Samel selects two dates after the filing of the Form 10-Q, contending that the market did not react significantly, and concludes that this purportedly factual analysis "eviscerate[s]" the SEC's allegation of materiality.   (Samel Memorandum at 13).

However, on a Rule 12(b)(6) motion, "a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino, 228 F.3d at 161.   "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 231-32, 108 S.Ct. 978 (quoting TSC Industries Inc. v. Northway, Inc., 426 U.S. 438 (1976)).   Materiality, moreover, is a mixed question of law and

fact, and "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ganino, 228 F.3d at 162 (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)). See also Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir. 1994).

The Second Circuit, following the Supreme Court, has rejected a rigid formula as to materiality, including the use of numerical benchmarks regarding revenue, income and assets. Ganino, 228 F.3d at 162-63. Thus, for example, there is no requirement to allege or demonstrate any particular movement in a company's stock price in order to sustain the element of materiality on a Rule 12(b)(6) motion:

> The Defendants argue that the accounting irregularities were not material because there is no allegation that DCI stock price was affected by the overvaluation of assets in the SEC filings. However, the Supreme Court has warned against "confining materiality to a rigid formula." Basic, 485 U.S. at 236, 108 S.Ct. at 986. There is no requirement that stock prices fluctuate as a result of a defendant's misstatements or omissions in order for them to be material.

SEC v. DCI Telecommunications, Inc., 122 F. Supp. 2d 495, 499 (S.D.N.Y. 2000) (citing United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991), cert. denied, 502 U.S. 813 (1991); see also Ganino, 228 F.3d at 167 (refusing to dismiss complaint based on

factual argument that stock price did not drop); <u>Geiger v. Solomon-</u><u>Page Group</u>, 933 F. Supp. 1180, 1188 (S.D.N.Y. 1996) ("Evidence of stock price movement may be relevant to the issue of materiality but it is not determinative") (citing cases).

Samel relies for his argument to the contrary on a decision from the Third Circuit, <u>Oran v. Stafford</u>, 226 F.3d 275 (3d Cir. 2000), and on <u>In re Allied Corporation Securities Litigation</u>, No. 02 Civ. 3812 (GEL), 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003). In <u>Allied Corp.</u>, the plaintiff alleged that Allied Capital overvalued certain securities representing 10% of its total investments and failed to allege by what extent they were overvalued. The court held that the plaintiff failed to allege materiality for this reason. It rejected under those circumstances as factually inconclusive plaintiffs' evidence of stock price movement, the one argument plaintiffs attempted to make to establish materiality. <u>See</u> 2003 WL 1964184, at *6.

When viewed in their totality, the misrepresentations and omissions at issue here were clearly material. Penthouse overstated its quarterly revenues by approximately 9% and its income by an even more significant factor, converting a $167,000 loss into a "profit" of $828,000. Even were these the only misrepresentations at issue, they would suffice to establish materiality. <u>See</u> <u>Ganino</u>, 228 F.3d at 165-66 (reversing district court's dismissal of complaint where company overstated pre-tax

18

income in two quarterly reports by 11.7% and 8% and stating, "we believe it is inappropriate to determine at this stage of the litigation that these substantial amounts, both in absolute terms and as percentages of total net income for the respective quarters, were immaterial as a matter of law"); *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 410 (S.D.N.Y. 1998) (relying on *Basic* and declining to hold as a matter of law that misstatements affecting profits by no more than 2.54% were immaterial).

The financial misrepresentations at issue in this case were made simultaneously with a series of equally material and disturbing omissions and misrepresentations by Samel regarding the adequacy of Penthouse's disclosure controls. The Form 10-Q and the Sarbanes-Oxley certifications also are alleged to have reported falsely that it had been reviewed and signed by Guccione and omitted that it had not been reviewed by Penthouse's auditors or counsel. Whether considered independently, or in the context of Penthouse's deliberate overstatement of its revenue and income, these omissions relating to an absence of internal disclosure controls are material, especially since it was the deliberate avoidance of the auditor's review of Penthouse's financial statements that permitted the overstatement of Penthouse's revenue and income.

Samel has contended that because of the change in Penthouse stocks' market price on May 27, 2003[1] and June 5, 2003, (see Samel Memorandum at 13), specifically, the drop in stock price from $2.51 on May 23 to $2.39 on May 27 followed by the stock price's recovery to $2.50 on June 5, the SEC cannot demonstrate the materiality of the false filing. However, the stock price on these dates does not immediately follow any disclosure of any problems with Penthouse's Form 10-Q.

On June 13, after the close of business, Penthouse filed a Form 8-K. In this filing, Penthouse acknowledged the SEC's inquiry into its Form 10-Q and advised investors not to rely on that financial statement and assured investors that its transparently non-existent "disclosure controls and procedures" were adequate. The market apparently reacted significantly on June 16, the first trading day after this filing with a price drop of 11.32%. (See Bloomberg Price Chart, Primoff Dec. Exh. C).

According to the SEC, Penthouse did not make a substantially complete and corrective disclosure until September 25, 2003, when it amended its Form 10-Q for the first quarter. The market's response to Penthouse's disclosure was a 14.58% drop in the price of Penthouse's stock on September 26, 2003. (See Primoff Dec. Exh. C).

---

[1] Samel references May 24, but the correct date is May 27, the Tuesday following Memorial Day, and the first trading day after May 23 (the date the Form 10-Q was filed).

The materiality of the misrepresentations have been established by the facts alleged.

## 2.  Scienter

Samel contends that the complaint is "silent" as to scienter.  (See Samel Memorandum at 13).  However, the complaint has pleaded Samel's state of mind properly, and with more than sufficient particularity.  (See Complaint at ¶¶ 15-17, 18, 19, 20, 21).

## Counts Four and Six:  Aiding and Abetting

To establish aiding and abetting liability in this jurisdiction, the SEC must establish (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) "knowledge" of this violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation. See, e.g., IIT v. Cornfeld, supra, 619 F.2d at 922.  In this case, recklessness is sufficient for the required mental state.  See Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983); SEC v. Milan Capital Group, Inc., 2000 U.S. Dist. LEXIS 16204, *27 (S.D.N.Y. Nov. 9, 2000).

Samel's conduct in actually filing the false and misleading Form 10-Q and the Sarbanes-Oxley certification, (see Complaint at ¶¶ 17-19), is described in the complaint as set forth above. The complaint, along with the supporting factual allegations that were incorporated therein by reference, (see Complaint at ¶¶ 39, 45), have alleged that Samel acted with the requisite scienter and rendered "substantial assistance" in accomplishing Penthouse's reporting violations. Samel, nonetheless, argues that the SEC's complaint "has not sufficiently alleged facts to sustain this FRCP 12(b)(6) motion to dismiss." (Samel Memorandum at 15). Samel's argument is without merit.

Samel also has argued that since the complaint alleges that Galanis exercised "control and influence" over Samel, and acted to mislead him, it is impossible for Samel also to have rendered "substantial assistance" in connection with the filing of the Form 10-Q. (See Samel Memorandum at 16). In view of the factual allegations of Samel's specific misconduct in filing the Form 10-Q, the gist of Samel's argument appears to contend that Samel could not have acted with the requisite scienter. It is, however, belied by the specific factual allegations demonstrating Samel's fraudulent intent and is unsupported by any authority.

The aiding and abetting allegations are adequately alleged.

## Conclusion

For the foregoing reasons, the motion to dismiss the complaint is denied.

It is so ordered.

New York, NY
September 2 9 , 2005

ROBERT W. SWEET
U.S.D.J.